934 So.2d 846 (2006)
Reginald NORFLEET, Rene Norfleet, Sr., Zapata Norfleet, Byron Norfleet and Mercedes N. Ducre, all Individually and on Behalf of their Deceased Mother, Betty Butler Norfleet
v.
LIFEGUARD TRANSPORTATION SERVICE, INC., Sharon Dean, American Casualty Company of Reading Pennsylvania, Sunbridge Healthcare Corporation d/b/a Sunbridge Care & Rehab for New Orleans, et al.
No. 2005-CA-0501.
Court of Appeal of Louisiana, Fourth Circuit.
May 17, 2006.
Rehearing Denied July 25, 2006.
*849 Richard C. Trahant, Metairie, LA, Steven J. Rando, Law Offices of Steven J. Rando, L.L.C., Harahan, LA, Harry T. Lemmon, M. Lauren Lemmon, New Orleans, LA, for Plaintiffs/Appellants.
*850 Paul A. Eckert, Bastian & Associates, New Orleans, LA, and Margaret Diamond, McGlinchey Stafford, PLLC, New Orleans, LA, for Defendant/Appellee.
(Court composed of Judge TERRI F. LOVE, Judge LEON A. CANNIZZARO JR., Judge ROLAND L. BELSOME).
TERRI F. LOVE, Judge.
Reginald, Byron, Rene, Mercedes, and Zapata Norfleet appeal the jury findings and trial court decisions stemming from the death of their mother, Betty Norfleet. The jury allocated thirty percent fault to Easthaven Nursing Home and seventy percent fault to Lifeguard Transportation Service, Inc. Mrs. Norfleet's children filed a motion for JNOV or, alternatively, a new trial seeking to reallocate fault and increase damages. The trial court denied this motion on the above issues and Mrs. Norfleet's children timely appeal followed. We affirm the jury's findings entered by the trial court with the exception of the wrongful death claim. We reverse and render to award wrongful death damages to the children and amend the attorney's fees award to reflect the additional recovery of wrongful death damages pursuant to the contingency fee contract.

FACTUAL BACKGROUND AND PROCEDURAL HISTORY
Reginald, Byron, Rene, Mercedes, and Zapata Norfleet ("Norfleets") filed suit against Easthaven Nursing Home ("Easthaven") for negligence arising from the death of their seventy-three year old mother, Betty Norfleet ("Mrs.Norfleet"), a resident of Easthaven since 1992. Mrs. Norfleet suffered a stroke approximately one year prior to entering Easthaven. However, she regained her ability to fully communicate and feed herself prior to entering Easthaven. After becoming a resident of Easthaven, a portion of Mrs. Norfleet's left leg was amputated due to circulatory problems. The stroke and amputation rendered her wheelchair bound. Mrs. Norfleet's primary medical problems while at Easthaven consisted of hypertension, urinary tract infections, arthritis, high cholesterol, circulatory problems, and bedsores. Throughout her residence at Easthaven, at least one of her children visited with her daily.
Due to bedsores and other skin problems, an Easthaven driver, Sandra Patterson ("Ms.Patterson"), drove Mrs. Norfleet, accompanied by one of her children, Byron, to a dermatological appointment on September 18, 2001. On the drive home from the appointment, Mrs. Norfleet's wheelchair flipped backwards causing her to strike her head on the metal deck of Easthaven's van ("first accident"). Byron pulled his mother upright and she began to complain of head pain. Ms. Patterson drove Mrs. Norfleet back to Easthaven.
Later that day, an ambulance transported Mrs. Norfleet to Lakeland Hospital ("Lakeland") for an examination due to her possible head injury from the earlier fall in the van, the first accident. The hospital did not perform any x-rays, CT scans, or MRIs on Mrs. Norfleet after the fall. After approximately four hours, she was discharged with a diagnosis of a contusion and given post head trauma precautionary paperwork.
While being transported from the Lakeland emergency room to a Lifeguard Transportation Service, Inc. ("Lifeguard") ambulance, Mrs. Norfleet fell off the stretcher and struck her head again ("second accident"). Lifeguard transported Mrs. Norfleet back into Lakeland's emergency room for another examination. A CT scan revealed a subdural hematoma. Mrs. Norfleet underwent an emergency craniotomy performed by a neurosurgeon, *851 Dr. Joseph Epps ("Dr.Epps"). She was in a coma, but Dr. Cabiran stated she "appeared" to be awakening during the two and a half months after the surgery, until her death on December 4, 2001.
The Norfleets filed suit against Easthaven and Lifeguard alleging negligence and seeking survival and wrongful death damages, and any other damages proven at trial. Byron allegedly sustained personal injuries from the Easthaven accident and sought medical expenses, mental and physical pain and suffering, lost wages, loss of future insurability, damages for future functional impairment, and any other damages proven at trial. The trial court later granted Byron's motion for partial dismissal with prejudice for his personal injury claims. Lifeguard settled with the Norfleets prior to trial.
After a four-day jury trial, the jury returned a verdict in favor of the Norfleets and allocated fault between Easthaven and Lifeguard as thirty percent and seventy percent, respectively. The jury also awarded general and special damages for Mrs. Norfleet's survival action as follows:

 Physical pain and suffering $100,000.00
 Mental and emotional distress $ 52,000.00
 Medical expenses $343,000.00
 Funeral expenses $ 5,000.00
 ____________
 TOTAL AMOUNT $500,000.00

The jury did not award wrongful death damages to any of the Norfleets. The trial court judge entered the jury's verdict, reduced Easthaven's damages in proportion to their thirty percent liability, and awarded court costs to the Norfleets.
The Norfleets filed a motion for judgment not withstanding the verdict ("JNOV") or, alternatively, a new trial. The trial court partially granted the motion for a JNOV and increased the medical expenses to $343,792.25, and the funeral expenses to $5,700.00, to reflect the actual monetary amounts evidenced at trial. The trial court then adjusted Easthaven's portion according to its thirty percent liability. The trial court also awarded attorney's fees, pursuant to La. R.S. 40:2010.9, with legal interest to the Norfleets based on their forty percent contingency fee contract with their attorneys based on the amount of recoverable compensatory damages. The trial court also awarded full court costs to the Norfleets in the amount of $8,977.66. The trial court denied the Norfleets' alternative motion for a new trial. The Norfleets' devolutive appeal timely followed.

ASSIGNMENTS OF ERROR
The Norfleets assert the trial court erred by entering judgment on the jury verdict by: 1) incorrectly apportioning the fault between Easthaven and Lifeguard as thirty percent and seventy percent, respectively; 2) awarding inadequate survival damages; and 3) refusing to award wrongful death damages although the jury awarded survival damages. The Norfleets assert the trial court erred by excluding five of their proposed jury charges and by not correcting the above errors through the request for a JNOV or alternatively, a new trial.
Easthaven asserts the trial court erred by entering the jury's findings that Easthaven was thirty percent at fault and by awarding excessive attorney's fees, based on a contingency fee contract, and court costs.

STANDARD OF REVIEW
Appellate courts review factual findings of the trial court or jury using the "manifest error" or "clearly wrong" standard. Rosell v. ESCO, 549 So.2d 840, 844 (La.1989). The Louisiana Supreme Court developed a two-part test for reviewing and reversing the factfinder's determinations. Mart v. Hill, 505 So.2d 1120, 1127 *852 (La.1987). This bifurcated test states: 1) the reviewing court must find that the trial court's findings have no reasonable factual basis and 2) the record shows that the findings are wrong (manifestly erroneous). Mart, 505 So.2d at 1127. The reviewing court must view the record in its totality to determine if the factfinder was clearly wrong. Stobart v. State, Through Dept. of Transp. and Dev., 617 So.2d 880, 882 (La. 1993). The appellate court must determine if the factfinder's decision was a reasonable one. Id. This rationale stems from the fact that the trial court has "better capacity to evaluate live witnesses." Canter v. Koehring Co., 283 So.2d 716, 724 (La.1973). "[W]here two permissible views of the evidence exist, the factfinder's choice between them cannot be manifestly erroneous or clearly wrong." Stobart, 617 So.2d at 883. The majority of the issues presented in the case sub judice are factual questions and will be reviewed using the above standard.
Errors of law are reviewed de novo by the appellate courts. Balseiro v. Castaneda-Zuniga, 04-2038, p. 6 (La.App. 4 Cir. 8/17/05); 916 So.2d 1149, 1153.

ALLOCATION OF FAULT
Louisiana negligence claims are examined using a duty/risk analysis. Perkins v. Entergy Corp., 00-1372, p. 7 (La.3/23/01); 782 So.2d 606, 611. This analysis requires: 1) proof that defendant's substandard conduct was a cause-in-fact of the plaintiff's injuries; 2) proof that the defendant owed a duty to the plaintiff; 3) a breach of the duty; 4) proof that the defendant's substandard conduct was the legal cause of the plaintiff's injuries; and 5) damages. Id. The plaintiff must prove every element by a preponderance of the evidence. Riley v. Salley, 03-1601, p. 2 (La.App. 4 Cir. 4/21/04); 874 So.2d 874, 876. "Proof by direct or circumstantial evidence is sufficient to constitute a preponderance, when, taking the evidence as a whole, such proof shows that the fact or causation sought to be proved is more probable than not." Riley, 03-1601, p. 3, 874 So.2d at 876-77. Medical testimony can prove that an accident more probably than not caused a plaintiff's injuries. Id. at p. 2, 874 So.2d at 876.
After the factfinder establishes negligence, the amount of liability of each tortfeasor relies upon the doctrine of comparative fault when litigation involves multiple tortfeasors. La. C.C. art. 2323.[1] However, when one of the tortfeasors enters into a settlement prior to trial, the burden of proving the "liability of a settling defendant falls on the remaining defendants." Hoerner v. Anco Insulations, Inc., 00-2333, p. 28 (La.App. 4 Cir. 1/23/02); 812 So.2d 45, 66, citing Raley v. Carter, 412 So.2d 1045, 1047 (La.1982).
*853 The Norfleets and Easthaven assert the trial court erred by entering judgment on the jury's findings of fault. Easthaven avers that the Norfleets failed to carry their burden of proof that Easthaven was partially the cause-in-fact for Mrs. Norfleet's death. The Norfleets aver that Easthaven should be found one hundred percent liable. The jury stated on the verdict form that Easthaven caused or contributed to Mrs. Norfleet's death. However, the jury found that the degree of fault of Easthaven was thirty percent as opposed to Lifeguard's seventy percent.
Dr. Epps, the neurosurgeon who performed the craniotomy on Mrs. Norfleet, testified, via videotape, that a subdural hematoma may not manifest itself for four weeks. The first accident could have been the cause of the subdural hematoma because Mrs. Norfleet could have had lucid intervals without showing the signs of the head trauma before being discharged from Lakeland. However, he also stated that it was impossible to determine which accident more likely than not caused the subdural hematoma. Lastly, he testified that the subdural hematoma was a contributing factor in Mrs. Norfleet's death.
Dr. Steck, Easthaven's neurosurgery expert, testified pursuant to his review of Mrs. Norfleet's Lakeland medical records. He testified that there was no way to be "one hundred percent certain" which accident caused the subdural hematoma. However, he also stated that, in his opinion, the subdural hematoma was more probably than not caused by the second accident. Yet, he later stated that the first accident could have caused a hemorrhage worsened by the second accident. Further, Dr. Steck admitted that, in his opinion, a subdural hematoma may not present itself for ten hours and that he could not rule out the first accident as the cause of the subdural hematoma.
Lakeland's medical records also indicate that Mrs. Norfleet was discharged after the first accident with a contusion. Additionally, the records confirm the occurrence and extent of the second accident.
Our review of the record reveals that the jury's allocation of fault between Easthaven and Lifeguard does not constitute manifest error and is not clearly wrong. First, the second accident is proven by the existence of the medical records and the documentation contained therein. Second, the jury could have relied more heavily upon the testimony or Dr. Epps because he was the operating physician. Third, the jury might have given Dr. Steck's testimony less credibility because he reviewed medical records and had no direct role or contact with Mrs. Norfleet. Additionally, both experts testified that a subdural hematoma might not present itself within four hours, which was the time period after which Mrs. Norfleet was discharged from Lakeland after the first accident.
Given the conflicting evidence, we find the jury reasonably concluded that the first accident could have been the cause-in-fact of Mrs. Norfleet's subdural hematoma. Even if this Court would have allocated fault in different proportions, we do not find the jury's findings to be manifestly erroneous or clearly wrong after conducting a thorough review of the record. We also find that the trial court did not abuse its discretion or commit manifest error by denying a JNOV or new trial on this issue.

SURVIVAL QUANTUM
Having determined that the jury did not err by finding Easthaven liable for Mrs. Norfleet's death, we now address the Norfleets' survival damage issue. The right to pursue a survival action is granted by Louisiana Civil Code article *854 2315.1.[2] Pain and suffering damages should be awarded if there is the "slightest amount, or scintilla, of evidence of pain and suffering on the part of the deceased." Ambrose v. New Orleans Police Dep't Ambulance Serv., 627 So.2d 233, 244 (La.App. 4 Cir.1993), rev'd on other grounds, 93-3099 (La.07/05/94), 639 So.2d 216. This evidence can come from the "actions of the deceased or otherwise." Id. The time period used to calculate damages for pain and suffering is from the date of the injury to death. Id. at 244. An award is inappropriate if it "shocks the conscience." Riley v. Maison Orleans II, Inc., 01-0498, p. 11 (La.App. 4 Cir. 9/25/02); 829 So.2d 479, 487, quoting Moore v. Healthcare Elmwood, Inc., 582 So.2d 871, 879 (La. App. 5 Cir.1991).
Dr. Cabiran, Mrs. Norfleet's treating physician at Easthaven, testified that Mrs. Norfleet was in a coma following the craniotomy, but was beginning to come out of it. He stated that Mrs. Norfleet opened her eyes in response to pain. The medical records also indicated that Mrs. Norfleet occasionally moaned in pain and was alert the day she died. Mercedes, Mrs. Norfleet's daughter, also testified that she could see tears coming from her mother's eyes during the time after the craniotomy. Lastly, Dr. Epps testified that pain is not age dependent.
The Norfleets assert the trial court erred by refusing to increase the survival damages regarding the pain and suffering and emotional and mental distress damage awards based upon their motion for JNOV. Easthaven seeks to decrease the award. The jury awarded total damages of $500,000 and the trial court increased the amount to $501,492.25 to reflect the actual amount of medical and funeral expenses. The jury awarded $152,000 for physical pain and suffering and mental and emotional distress.
Upon thoroughly reviewing the record, we find the trial court did not err by entering a judgment on the jury's verdict, by denying the Norfleets' motion for a JNOV, or by denying a new trial on the issue of survival damages. This Court reduced an award of $115,000 to $75,000 for a man who suffered for less than one hour before his death. Ambrose, 627 So.2d at 244-45. The Louisiana Supreme Court increased a survival damages award, from $82,000 to $122,000, for the family of a seventy-five year old after she suffered for approximately one month prior to her death. Jones v. St. Francis Cabrini Hospital, 94-2217 (La.4/10/95); 652 So.2d 1331, 1336. Lastly, this Court also upheld a $100,000 survival award in the death of a seventy-five year old who suffered for about twenty-two days. Jones v. Payton, 548 So.2d 1260, 1262 (La.App. 4 Cir.1989). This Court stated: "although the award of $100,000 for Mrs. Findlay's survival action is high, it is neither outrageously excessive nor an abuse of the trial judge's discretion." Id.
According to the testimony and medical records, it is apparent that Mrs. Norfleet suffered some degree of pain and was not fully comatose for the two and a half months following her craniotomy. Mrs. Norfleet moaned, responded to pain by opening her eyes and moving, and had tears coming from her eyes. Thus, we do *855 not find that the jury committed manifest error, was clearly wrong, or shocked the conscience by awarding $152,000 for two and a half months of pain. We also find that the trial court did not abuse its discretion or commit manifest error by denying a JNOV or new trial on this issue.

WRONGFUL DEATH AWARD/CONSORTIUM
A wrongful death action is intended to compensate the deceased's loved ones for the losses they sustained as a result of the death. La. C.C. art 2315.2.[3] "Elements" used to determine wrongful death awards can include "loss of love and affection, loss of services, and loss of support." Turner v. Lyons, 03-0186, pp. 11-12 (La.App. 4 Cir. 1/28/04); 867 So.2d 13, 21. "Much discretion must be left to the judge or jury" in determining damages. La. C.C. art. 2324.1. Therefore, determining the amount or "quantum" of damages is a fact determination for the jury and is "entitled to great deference on review." Trunk v. Med. Ctr. of La. at New Orleans, 04-0181, p. 9 (La.10/19/04); 885 So.2d 534, 539, citing Wainwright v. Fontenot, 00-0492, p. 6 (La.10/17/00); 774 So.2d 70, 74. However, when the jury commits an error of law and fails to award damages when the plaintiffs have proven their injuries, the appellate court must make an initial damage award. Boulmay v. Dubois, 593 So.2d 769, 773-74 (La.App. 4 Cir.1992). Therefore, we must examine testimony from the trial to discern whether the jury committed legal error by declining to award the Norfleets wrongful death or loss of consortium damages.
All five of Mrs. Norfleet's children testified at trial as to their close relationship with their mother. First, Byron Norfleet ("Byron"), the oldest child at fifty-six years old, testified about the trip to his mother's dermatologist and how he struggled to free her after her wheelchair fell over in the van. He also stated that he had worked since he was sixteen to help support his family after his father left. He also helped take care of his mother after her stroke. Byron stated that the decision to put Mrs. Norfleet in a nursing home was the hardest decision he and his siblings ever had to make. He also stated that he visited his mother at Easthaven every Monday and Tuesday and some other mornings. He stated that she retained her mental capacity after her stroke. Lastly, he testified as to how they would watch television together and about his mother's kindness.
Second, Mercedes N. Ducre ("Mercedes"), Mrs. Norfleet's only daughter, testified that her mother was her best friend. Mercedes visited her mother at Easthaven every day. Mercedes also tried to keep her mother's mind nimble after she suffered a stroke in 1992. She would quiz her on past events and discuss current events. For example, Mrs. Norfleet was very troubled by the events of September 11, 2001 ("911"), and discussed them at length prior to her accidents on September 18, 2001. Mercedes also stated that her mother was able to feed herself after the stroke, but needed help getting to and from her wheelchair. Mrs. Norfleet also participated in many activities while at Easthaven, including bingo, going to church, and birthday parties. Mercedes testified that *856 she and her siblings would bring cake and presents to Easthaven for Mother's Day celebrations. They would also take Mrs. Norfleet out of Easthaven for holidays like Thanksgiving and Christmas. Overall, Mercedes stated that she felt that she had been deprived of a future with her mother and best friend.
Third, Reginald Norfleet ("Reginald"), Mrs. Norfleet's second oldest son, testified that his mother taught him to be self-sufficient and reiterated that either he or one of his siblings visited their mother at Easthaven everyday for ten years. He also stated that his mother's mental capacity was great, especially her long term memory, after the stroke because they would get her to detail their family history. He further testified that he lived with his mother until he was twenty-nine and ran errands for her. Lastly, he stated that he and his siblings have no peace of mind since his mother died because she stays on their minds all the time.
Fourth, Rene Norfleet ("Rene"), the second youngest son, testified that after he divorced his wife, he moved back into his mother's house with two of his children. Mrs. Norfleet then participated in raising his children and assumed an important role in their everyday lives. Like, Mercedes, he said that his mother was one of his best friends. Following Mrs. Norfleet's stroke, Rene took care of her for fourteen months until the Norfleets placed her in Easthaven. During that time, he took care of all of her financial burdens, totaling between $50,000 and $60,000, and did not ask for contributions from his other siblings. After entering Easthaven, Rene brought his mother seafood every Friday, while Mercedes would cook Sunday dinner with dessert prepared by Rene's wife. The last time he visited with his mother at Easthaven, they discussed 911 and she advised him to stop investing in the stock market because of the fluctuations following the tragedy.
Fifth, Zapata Norfleet ("Zapata"), the youngest son, testified that he lived with his mother his entire life until she began to live at Easthaven. While Rene supported Mrs. Norfleet after her stroke, Zapata also lived with them to help feed, bathe, and otherwise take care of her. While she was at Easthaven, he would visit her two or three times a week. Lastly, he stated that he missed the sound of his mother's voice the most.
Dr. Cabiran testified that documents from the nursing home employees corroborated that at least one of the Norfleets visited their mother everyday during her ten-year residence at Easthaven.
After a thorough review of the record, we find that the jury committed legal error by declining to award wrongful death damages to the Norfleets because they proved a loss due to the death of Mrs. Norfleet. Therefore, we must make an initial wrongful death damage award. Applicable jurisprudence provides that the range in wrongful death awards to major children in a close family for the death of an elderly parent ranges from $12,500 to $150,000, depending upon the evidence in the record. Thomas v. Sisters of Charity of the Incarnate Word, 38,170 (La.App. 2 Cir. 3/19/04); 870 So.2d 390; Turner v. Lyons, 03-0186 (La.App. 4 Cir. 1/28/04); 867 So.2d 13; Brodtmann v. Duke, 96-0257 (La.App. 4 Cir. 2/11/98); 708 So.2d 447; Watkins v. Bethley, 27554 and 27555 (La.App. 2 Cir. 11/01/95); 662 So.2d 839; Vedros v. Pub. Grain Elevator of N.O., Inc., 94-0659 (La.App. 4 Cir. 4/13/95); 654 So.2d 775.
Brodtmann awarded the largest amount of $150,000 because the trial court found that the family was very close and relied upon their sixty-year old father as a *857 "great source of emotional support." 96-0257, p. 22, 708 So.2d at 460. However, this Court stated that the award was on the higher end of the spectrum, but not an abuse of discretion. Id. In Turner, this Court reduced $150,000 awards to $50,000 for the major children that testified at the trial and reduced the award to $20,000 for the major children who did not testify. 03-0186, p. 19, 867 So.2d at 25-26. This Court reasoned that the extent of familial closeness in Brodtmann did not exist and that the impact of the sixty-year old mother's death on the non-testifying children was only generally established. Id. at p. 19, 867 So.2d at 25-26. This Court upheld a $12,500 award to major children of a sixty-seven year old decedent. Vedros, 94-0659, 654 So.2d at 781. The daughter in Vedros, testified that they relied upon their father for advice and friendship. Id. 654 So.2d at 780. Both children spoke with their father everyday and the son stated that his father was his best friend. Id. However, this Court stated that they were not "unusually dependent" on their father. Id. This Court stated that the award was less than what it would have awarded. Id.
The Louisiana Second Circuit Court of Appeal upheld a $25,000 award for the death of an eighty-two year old father based upon his age and health. Thomas, 38,170, p. 15, 870 So.2d at 399-400. However, the court stated that the award was on the lower end of the "possible damages" spectrum. Id. The Second Circuit also upheld an initial wrongful death damages award of $50,000 to major children in the death of their eighty-one year old father. Watkins, 27554 and 27555, p. 7, 662 So.2d at 843. The trial court found the family to be very close and that the father instilled a "strong sense of family, the value of hard work and a respect for education" in all of his eleven children. Id. at p. 6, 662 So.2d at 843.
Considering the extreme closeness of the Norfleet family, shown by the visits to Easthaven everyday for ten years to visit with their lucid mother, the fact that their father left when Byron was sixteen, and their reliance on their mother's advice and companionship, we award each of Mrs. Norfleet's children $75,000 for her wrongful death. This amount is reduced by Lifeguard's seventy percent liability; therefore, the award to each child is $22,500.

JURY CHARGES
The Norfleets argue that the trial court committed legal error by excluding jury charges forty-three through forty-five and forty-seven, and by excluding the ease of association doctrine. A legal error occurs when the "trial court applies incorrect principles of law and such errors are prejudicial." Lam v. State Farm Mutual Auto. Ins. Co., 03-0180, p. 4 (La.App. 4 Cir. 4/01/05); 901 So.2d 559, 564, writ granted, 05-1139 (La.6/24/05), 904 So.2d 749. The error becomes prejudicial when it "materially" affects "the outcome" and deprives "a party of substantial rights." Id.
The proposed jury charges stated:
Plaintiffs' Proposed Special Jury Instruction 43
The rule that multiple defendants can be held liable for damages sustained in separate accidents when those damages cannot be separated among the accidents may have logical application in those cases where the accidents are basically simultaneous. Jarreau v. Hirschey, 93-1402 (La.App. 1 Cir. 12/07/94), 650 So.2d 1189, 1194
Plaintiffs' Proposed Special Jury Instruction 44

*858 Where two or more causes combine to produce a single result, incapable of any logical division, each may be a substantial factor in bringing about the loss, and if so each may be charged with all of it... Entire liability rests upon the obvious fact that each has contributed to the single result, and that no rational division can be made. Bergeron v. Thomas, 314 So.2d 418, 425-426 (La.App. 4th Cir. 1975) citing Prosser on Torts (2nd Ed.), p. 226

Plaintiffs' Proposed Special Jury Instruction 45
The "single indivisible injury" rule states, "Where two or more persons acting independently are guilty of consecutive acts of negligence closely related in point of time, and cause damage to another under circumstances where the damage is indivisible, i.e., it is not reasonably possible to make a division of the damage caused by the separate acts of negligence, and negligent actors are jointly and severally liable." Bergeron v. Thomas, 314 So.2d 418, 428 (La.App. 4th Cir.1975) citing Ruud v. Grimm, 252 Iowa 1266, 110 N.W.2d 321
Plaintiffs' Proposed Special Jury Instruction 47
Where two or more causes combine to produce a single result, incapable of any logical distinction, each may be a substantial factor in bringing about the loss, and it so, each must be charged with all of it. Probst v. Wroten, 433 So.2d 734 (La.App. 5th Cir.1982) citing Prosser on Torts (2nd Ed.), p. 250

Lastly, the Norfleets sought to have the ease of association doctrine[4] included as a jury charge.
While the proposed jury charges are accurate quotes, we find their emphasis is taken out of context and misplaced. First, Proposed Jury Instruction Forty-three applies to "accidents that are basically simultaneous." Jarreau v. Hirschey, 93-1402 (La.App. 1 Cir. 12/07/94), 650 So.2d 1189, 1194. However, Jarreau involved two accidents approximately three weeks apart. Id. 650 So.2d at 1191. Jarreau further states, "[s]olidary liability between tortfeasors does not arise where each of the tortfeasors commits an entirely separate, negligent act." Id. at 1194. Like the case sub judice, Jarreau involved physicians who could not identify which injuries came from which accident. Id. at 1194-95. The court did not apply the solidary liability rule. Id. at 1195.
Second, Proposed Jury Instructions Forty-four and Forty-five involve the "single indivisible injury rule."[5]Bergeron v. Thomas, 314 So.2d 418, 425-28 (La.App. 1 Cir.1975). Bergeron involved two virtually *859 instantaneous car crashes. Id. at 419-20. However, the court determined that the accidents were distinct enough not to warrant the application of the rule. Bergeron, 314 So.2d at 426. Also, the crux of Proposed Jury Instruction Forty-five comes from a dissent in the case. Id. at 428.
Third, the rule in Proposed Jury Instruction Forty-seven required one defendant to accept full liability for the plaintiff's injuries because the defense did not present evidence that could attribute certain injuries to one of the two accidents. Probst v. Wroten, 433 So.2d 734, 743 (La. App. 5 Cir.1982).
Last, ease of association can apply when the original tortfeasor, in this case, Easthaven, becomes liable for additional injuries suffered by the plaintiff while being treated for the original injuries. Hernandez v. Chalmette Med. Ctr., 01-0074, 03-1169, and 03-1456, p. 12 (La.App. 4 Cir. 2/04/04); 869 So.2d 141, 149. However, the risk of negligence does not include separate accidents, even if the second accident aggravates a preexisting condition. Franz v. Ledoux, 03-2080, pp. 5-6 (La. App. 4 Cir. 2/04/04); 869 So.2d 137, 140.
"A jury instruction must reflect the applicable law but not confuse the jury." Lam, 03-0180, p. 14, 901 So.2d at 570. We find that the trial court's refusal to include the jury instructions did not mislead the jury. The proposed instructions do not apply in situations where the two accidents occur close in proximity even if testifying physicians cannot allocate each injury to each accident. Also, in Bergeron, the courts refused to apply the rules to two simultaneous accidents. The jury found Easthaven liable in spite of the excluded proposed jury charges. While this Court may have allocated fault differently, the legal decision to exclude jury instructions which included inapplicable law was not an error. We also find that the trial court did not abuse its discretion or commit manifest error by denying a JNOV or new trial on this issue.

ATTORNEY'S FEES AND COURT COSTS
Easthaven avers the trial court erred by granting the Norfleets attorney's fees based on their contingency fee contract with their attorneys and all of the court costs. Easthaven asserts that they should not be required to pay the full amount because the Norfleets settled with Lifeguard prior to trial. Thus, Easthaven asserts that all of the attorney's fees and court costs were not incurred in the pursuit of a judgment against Easthaven. At most, Easthaven asserts they should be responsible for thirty percent of the fees because that equals the amount of fault the jury apportioned to Easthaven. Easthaven also argues that it should not have to pay court costs because the Norfleets failed to prevail on every issue at trial.
Louisiana law provides that courts may "render judgment for costs, or any part thereof, against any party, as it may consider equitable." La. C.C.P. art.1920. Also, the Nursing Home Residents Bill of Rights provides that "any plaintiff who prevails in such an action [pursuant to La. R.S. 40:2010.8] shall be entitled to recover reasonable attorney fees, and costs of the action." La. R.S. 40:2010.9. A court may consider a contingency fee contract when awarding attorney's fees, but the court is not bound by the contract's terms. Rivet v. State, Dep't of Transp. & Dev., 01-0961, p. 6 (La.11/28/01); 800 So.2d 777, 782. The Norfleets aver that courts uphold contingency fee contracts if warranted. Brumfield v. Coastal Cargo Co., 99-2756 (La.App. 4 Cir. 6/28/00); 768 So.2d 634; Short v. Plantation Mgmt. Corp., 99-0899 (La.App. 1 Cir. 12/27/00); 781 So.2d 46.
*860 The Louisiana Supreme Court has established a number of factors used to determine the reasonableness of attorney's fees. Corbello v. Iowa Prod., 02-0826, p. 35 (La.2/25/03); 850 So.2d 686, 710. These factors include: 1) the ultimate result obtained; 2) the responsibility incurred; 3) the importance of the litigation; 4) the amount of money involved; 5) the extent and character of the work performed; 6) the legal knowledge, attainment, and skill of the attorneys; 7) the number of appearances made; 8) the intricacies of the facts involved; 9) the diligence and skill of counsel; and 10) the court's own knowledge. State, Dep't of Transp. and Dev. v. Williamson, 597 So.2d 439, 442 (La.1992).
After consideration of the Williamson factors, we find the trial court's award of attorney's fees did not constitute an abuse of discretion. First, the Norfleets prevailed at trial. Second, the responsibility in preparing for and conducting a four-day trial with numerous experts and family witnesses is extensive. Third, the Norfleets' counsel had to review and interpret the large amount of Lakeland medical records contained in the record. Fourth, the type of work involved required the Norfleets' counsel to become familiar with intricate medical terminology and procedures. Fifth, it also required the Norfleets' counsel to prepare for and take numerous depositions. Sixth, the amount of appearances made by the Norfleets' counsel was great when considering the number of depositions and hearings conducted prior to trial. Seventh, the fifth factor shows the intricacy of the medical problems at issue in the trial. Eighth, there is no doubt in the record that the attorneys representing the Norfleets were adequate. Lastly, the trial court's knowledge of the intricate issues of this trial and the length of the trial warrant consideration in awarding attorney's fees.
Easthaven asserts that it should not be liable for all of the attorney's fees because the jury found it thirty percent liable. However, the trial court considered the fact that the Norfleets' attorneys prepared for trial against Easthaven and Lifeguard and that the jury split liability between the two defendants. After weighing all of the Williamson factors and Easthaven's liability concerns, we cannot say that the trial court committed manifest error or abused its discretion.
The Norfleets' contingency fee contract contains a provision that increases the amount of attorney's fees if an appeal is filed. However, in the case sub judice, the Norfleets filed the appeal. "Therefore, an increase in attorney's fees would not be appropriate." Buras v. Schultz, 02-0628, p. 5 (La.App. 4 Cir. 9/18/02); 828 So.2d 649, 652.
When awarding court costs, Louisiana courts are "vested with great discretion." Greene v. Greene, 94-79 (La. App. 3 Cir. 10/05/94); 643 So.2d 891, 894. "The trial court may assess costs in any equitable manner and its assessment will not be reversed on appeal in the absence of an abuse of discretion." Adams v. Canal Indem. Co., 99-1190, pp. 12-13 (La. App. 3 Cir. 5/10/00); 760 So.2d 1197, 1205.
The trial court awarded court costs to the Norfleets in the amount of $8,977.66 because they prevailed at trial. As this is the customary method of awarding court costs, we do not find that the trial court abused its discretion.
We find the trial court did not abuse its discretion or commit manifest error when deciding to award full attorney's fees and court costs to the Norfleets. However, we now amend the attorney's fee award and increase it to reflect the additional recovery of wrongful death damages, *861 pursuant to the contingency fee contract agreement upheld by the trial court.

DECREE
We affirm the jury's findings except in regards to wrongful death and the award of attorney's fees. We reverse and render to award wrongful death damages in the amount of $22,500 to each of the Norfleets and amend the attorney's fees award to reflect the additional recovery award of wrongful death damages pursuant to the Norfleets' contingency fee agreement.
AMENDED AND AFFIRMED IN PART; REVERSED AND RENDERED IN PART.
NOTES
[1] La. C.C. Art. 2323: Comparative fault reads, in pertinent part:

A. In any action for damages where a person suffers injury, death, or loss, the degree or percentage of fault of all persons causing or contributing to the injury, death, or loss shall be determined, regardless of whether the person is a party to the action or a nonparty, and regardless of the person's insolvency, ability to pay, immunity by statute, including but not limited to the provisions of R.S. 23:1032, or that the other person's identity is not known or reasonably ascertainable. If a person suffers injury, death, or loss as the result partly of his own negligence and partly as a result of the fault of another person or persons, the amount of damages recoverable shall be reduced in proportion to the degree or percentage of negligence attributable to the person suffering the injury, death, or loss.
B. The provisions of Paragraph A shall apply to any claim for recovery of damages for injury, death, or loss asserted under any law or legal doctrine or theory of liability, regardless of the basis of liability.
[2] La. C.C. art. 2315.1: Survival action reads, in pertinent part:

A. If a person who has been injured by an offense or quasi offense dies, the right to recover all damages for injury to that person, his property or otherwise, caused by the offense or quasi offense, shall survive for a period of one year from the death of the deceased in favor of:
(1) The surviving spouse and child or children of the deceased, or either the spouse or the child or children.
[3] La. C.C. art 2315.2: Wrongful death action reads, in pertinent part:

If a person dies due to the fault of another, suit may be brought by the following persons to recover damages which they sustained as a result of the death:
(1) The surviving spouse and child or children of the deceased, or either the spouse or the child or children.
[4] Ease of association is part of the duty analysis in Louisiana's duty/risk analysis. Alaimo v. Racetrack at Evangeline Downs, Inc., 04-1230, p. 4 (La.App. 3 Cir. 2/02/05); 893 So.2d 190, 193, citing Todd v. State Through Dep't of Soc. Servs., 96-3090 (La.9/09/97); 699 So.2d 35, 39. The doctrine requires an "ease of association between that risk and the legal duty." Todd v. State Through Dep't of Soc. Servs., 96-3090 (La.9/09/97); 699 So.2d 35, 39. The ease of association doctrine may apply to cases where the original tortfeasor becomes liable for injuries sustained by the plaintiff while being treated for the original injury. Hernandez v. Chalmette Med. Ctr., 01-0074, 03-1169, and 03-1456, p. 12 (La.App. 4 Cir. 2/04/04); 869 So.2d 141, 149.
[5] The "single indivisible injury rule" involves damages and injuries that are indivisible. Maraist v. Alton Ochsner Med. Found., 00-0404, p. 7 (La.App. 1 Cir. 4/04/01); 808 So.2d 566, 569-70. For example, Maraist involved one proven injury. Id. at p. 7, 808 So.2d at 570. When the factual situation of a case provides for the trier of fact with a way to "distinguish between the causation of the injuries sustained," the instruction is not required. Bergeron v. Thomas, 314 So.2d 418, 426 (La.App. 1 Cir.1975).